UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLINA GRACIA, individually and as successor-in-interest to LOUIE GRIJALVA IV,<br><br>                Plaintiff,<br><br>        v.<br><br>COUNTY OF KERN, et al.,<br><br>                Defendants. | Case No.: 1:23-cv-01104-JLT-CDB<br><br>**FINDINGS AND RECOMMENDATIONS TO GRANT IN PART AND DENY IN PART DEFENDANT COUNTY'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Doc. 57)<br><br><u>14-Day Objection Period</u><br><br>Pretrial Conference: June 22, 2026, at 1:30 p.m.<br>Jury Trial: September 15, 2026, at 8:30 a.m. |

Plaintiff Carolina Gracia is represented by counsel in this civil rights action in which she asserts claims pursuant to 42 U.S.C. section 1983. This action proceeds against Defendant County of Kern, David Navarro,[1] and Does 1 through 10, as alleged in the operative second amended complaint.

**I.      RELEVANT PROCEDURAL BACKGROUND**

On January 23, 2026, Defendant County of Kern filed a motion for summary judgment. (Doc. 57.)

On January 28, 2026, this action was reassigned from magistrate judge Barbara A.

---

[1] As previously noted (*see* Doc. 60, n.1), Defendants have indicated the parties agreed to "'dismiss Defendant Navarro, leaving the only (federal) Monell Claim against the County.'" Nevertheless, no party has submitted a stipulation to dismiss Navarro or any similar pleading as of today's date.

McAuliffe to the undersigned. (Doc. 58.) The following day, the hearing noticed for February 20, 2026, before the presiding district judge was vacated; the undersigned ordered that a hearing would be scheduled, if warranted, after briefing on Defendants' motion was complete. (Doc. 59 [Minute Order].)

On February 17, 2026, after Plaintiff failed to file either an opposition or a statement of non-opposition to Defendants' pending summary judgment motion, the Court issued its Order to Show Cause (OSC) in Writing Why Sanctions Should Not Be Imposed for Plaintiff's Failure to File an Opposition or Statement of Non-Opposition to Defendants' Motion for Summary Judgment. (Doc. 60.) Specifically, Plaintiff was ordered to respond to the OSC within seven days, or, alternatively, to file an opposition or statement of non-opposition to the summary judgment motion. (*Id*. at 3.)

On February 19, 2026, Defendants filed their Notice of Lodging of Exhibits in Support of Defendants Motion for Summary Judgment. (Doc. 62.)

On February 24, 2026, Plaintiff timely filed the Declaration of Jerry L. Steering in Response to Order to Show Cause Re Sanctions for Failure to File Opposition to Defendants' Motion for Summary Judgment. (Doc. 63.)

On February 27, 2026, the Court issued its Order Discharging OSC and Order Denying Plaintiff's Request for an Extension of Time Within Which to Oppose Defendants' Summary Judgment Motion. (Doc. 64.) More specifically, the Court determined that Plaintiff's mistakes and carelessness did not amount to excusable neglect as concerns the failure to file an opposition to Defendants' summary judgment motion and denied Plaintiff's request for an extension of time to file an opposition. (*Id*. at 3-7.) Thus, Defendants' motion is unopposed.

**II.     APPLICABLE LEGAL STANDARDS**

**A. Motions for Summary Judgment**

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents,

2

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or shows that the materials cited by the movant do not establish the absence of a genuine dispute. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Further, the opposing party must also demonstrate that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of "thin air," and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

A court may grant an unopposed or inadequately opposed motion for summary judgment if the supporting papers are themselves sufficient to warrant granting the motion and do not on their face reveal a genuine issue of material fact. *See Henry v. Gill Industries, Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

### B. *Monell* Liability[2]

"A municipality may be held liable under § 1983 'when execution of a government's policy or custom, whether made by its lawmakers or by those edicts or acts may be fairly said to represent official policy, inflicts the injury.'" *Burke v. County of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009) (quoting *Monell*, 436 U.S. at 694). To establish municipal liability under section 1983, a plaintiff must show that (1) he was deprived of a constitutional right; (2) defendant had a policy or custom; (3) the policy or custom amounted to a deliberate indifference to his constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Burke*, 586 F.3d at 734.

A policy under *Monell* is "a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143

---

[2] *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 694 (1978).

4

(9th Cir. 2012) (internal quotations & citation omitted). The Ninth Circuit recognizes two types of policies under *Monell*: "A policy of action is one in which the [entity] itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on [the entity's] 'failure to implement procedural safeguards to prevent constitutional violations.'" *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (quoting *Tsao*, 698 F.3d at 1143). In "inaction cases," establishing deliberate indifference under *Monell* "requires showing that the defendant 'was on actual or constructive notice that its omission would likely result in a constitutional violation.'" *Id*. (quoting *Tsao*, 698 F.3d at 1145).

A custom is "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotations omitted). The custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (internal quotation omitted). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). And "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the [local government entity] and the opportunity to conform to constitutional dictates.'" *Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011).

An entity is deliberately indifferent "when the need for more or different action 'is so obvious, and the inadequacy [of the procedure at issue] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1477-78 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

### III.    FACTUAL BACKGROUND

Decedent Louie Grijalva IV (Grijalva) was arrested and detained at the Kern County Jail's Lerdo Pre-Trial Facility on February 14, 2022. (Doc. 43 at 10, ¶ 26.) Grijalva was denied bail and was convicted of second degree burglary on May 25, 2022. (*Id*. at 10, ¶¶ 27-28.) Thereafter,

Grijalva began serving a two year, eight-month sentence at the Lerdo facility and was housed in a one-man cell. (*Id.* at 11, ¶ 29.)

On June 27, 2022, Grijalva ingested fentanyl, by itself or in combination with other dangerous drugs, and suffered an overdose. (Doc. 43 at 23, ¶ 86.) After suffering overdose symptoms for several hours, Grijalva died of acute fentanyl toxicity. (*Id*. at 24, ¶¶ 89-90.)

## IV.    PLAINTIFF'S CLAIMS

In the operative second amended complaint, Plaintiff asserts Eighth/Fourteenth Amendment conditions of confinement and deliberate indifference to serious medical needs claims against Defendants Navarro and Does 1 through 10 (Doc. 43 at 10-33), Fourteenth Amendment state created danger and interference with familial association claims against Defendants Navarro and Does 1 through 10 (*id*. at 33-44), municipal liability for constitutional violations against Defendant County (*id*. at 44-56), and state law failure to summon medical care for prisoner in immediate need, negligence, and wrongful death claims against Defendants Navarro, County, and Does 1 through 10 (*id*. at 56-82).

## V.    DEFENDANT COUNTY'S STATEMENT OF UNDISPUTED FACTS

1. Plaintiff Carolina Gracia is the natural and legal mother of Louie Grijalva, IV, and is his successor-in-interest.

2. Louie Grijalva IV ("Grijalva") died intestate and without issue on June 27, 2022 at the Kern County Jail – Lerdo Pre-Trial Facility where he was incarcerated as a convicted prisoner.

3. Defendant County of Kern is a political subdivision of the State of California and is a municipal entity within the territorial jurisdiction of this Honorable Court.

4. The Kern County Sheriff's Office ("KCSO") is a law enforcement agency/entity of the Defendant County of Kern, operating under the authority of Defendant County of Kern for the purpose of enforcing California law within the jurisdiction of Defendant County of Kern.

5. Defendant County of Kern, by and through KCSO and its agents, administrates Kern Couty Jail, Lerdo and is responsible for its day to day operations.

6

6. Defendant David Navarro is a Deputy Sheriff who at all times complained of was employed by the KCSO, at the Lerdo Facility.

7. At all times complained herein, Defendant Navarro was acting as an individual person under color of state law, pursuant to his authority as a KCSO deputy and was acting in the course and scope of his employment with Defendant County of Kern.

8. On February 14, 2022, Grijalva was arrested and taken into custody at the Lerdo Facility where he was incarcerated as a pretrial detainee.

9. Grijalva was denied bail following his arrest and remained in the Lerdo Facility pending trial.

10. On May 25, 2022, Grijalva was convicted of violating Cal. Pen. Code section 460(b) (second degree burglary).

11. Following his conviction, Grijalva was sentenced to two years and eight months incarceration.

12. On or about June 27, 2022, while in KCSO/County custody at Lerdo Jail, and confined alone in a cell, Grijalva ingested fentanyl, by itself or in combination with other dangerous drugs, and suffered an overdose.

13. As a result of the overdosing on fentanyl, Grijalva began suffering serious and obvious medical distress.

14. Ultimately, on June 27, 2022, Grijalva died from acute fentanyl toxicity.

15. Some substances, such as fentanyl, are especially dangerous, because only a small amount is sufficient to induce death via overdose.

16. The dangers of fentanyl are widely discussed and well-known in the law enforcement/corrections community.

17. The general public is likewise aware of the dangers of fentanyl, and the "fentanyl crisis" or "opioid crisis" is a topic that has received attention in the national news media for many years.

18. Lt. Stephen Harris is employed with the Kern County Sheriff's Office as a Detentions Lieutenant.

7

19. Harris is a peace officer.

20. Harris's most common search warrant is for a physical cavity search (of an inmate).

21. Harris is in charge of population management.

22. Harris has been with the County for 19 years.

23. Harris in charge of classifications, detentions investigations unit, and the detentions canine unit.

24. There are different colored bands to indicate the type of inmate. A staff assaultive inmate has an orange band and alerts the deputies that the must be cautious and have two officers escorting them.

25. Grijalva was in D-Pod which was an administrative unit at the time of his death.

26. During 2017-2022, the Lerdo facility had the following measures to detect the present of illicit narcotics in jail: random cell searches, pat-down searches of inmates, body scanners, and metal detectors when [returning] to their unit anytime they were outside of the facility.

27. Harris is trained to view body scanner images and is familiar with looking at images of body scans.

28. Drugs appear on the scanner like a darker area or an anomaly; sometimes round or sometimes a long stabbing device (if it's a weapon).

29. The Lerdo facility did not have dogs in 2022, but they do now.

30. In 2017 the Lerdo facility had 8 incidents in which they located drugs.

31. In 2018 the Lerdo facility had 12 such incidents.

32. In 2019 the Lerdo facility had 15 such incidents.

33. In 2020 the Lerdo facility had 7 such incidents.

34. In 2021 the Lerdo facility had five such incidents.

35. In 2022 the Lerdo facility had five such incidents.

36. Harris is aware of the problem in A-Pod in June of 2022 where there were three overdoses within a five day period.

37. One was confirmed fentanyl, the others were assumed fentanyl.

8

38. Fentanyl was brought to the deputies' attention as it was coming into the jail around 2020, 2021.

39. Fentanyl is easier to conceal because less is needed to produce the same narcotic effect as heroin.

40. Increased staffing and money allowed the department to bring in new units, including the drug detection dogs.

41. During 2022 the Lerdo facility did not have a canine unit assigned to the jail.

42. During this time, an operation site canine, who was dual trained in both apprehension and detection, was brought in to search Unit 5.

43. Drugs are brought into the jail many different ways, including by recently released inmates who ingest the drugs then commit a crime to be recommitted; through the mail system in the glue on the envelopes; court clothes brought in from family members to unsuspecting attorney offices; planned fake medical emergencies to unsuspecting hospitals.

44. Harris recalls one instance of a deputy bringing drugs into the jail when he was new.

45. KCSO was not able to determine how Grijalva obtained the fentanyl.

46. On the day Grijalva passed, he was moved from A-Pod to D-Pod because he was caught with a jailhouse shank.

47. Deputy Navarro was assigned to D-Pod on the day of the incident.

48. Deputy Navarro made a security sweep on or around hours 14:31 on the day of the incident.

49. At 15:19 there was a medical priority called to Grijalva's door.

50. At 15:21 hours, medical staff arrived at Grijalva's door.

51. Drugs are sometimes passed through the fire door. In the pods there are six units connected by a security door, a "fire door". The fire door has a small gap underneath and sometimes the inmates manipulate the weather stripping and move narcotics that way.

52. All pods are set up the same way and have fire doors.

53. Every hour a floor deputy will make his rounds and complete cell safety checks, after which he makes an entry into the logbook.

54. During the cell checks, the deputies walk into each unit, check on the stat or the welfare of each inmate.

55. The deputy checks cell by cell, looking into the cell, looking for any obvious contraband or illegal activity happening in the cell, as well as just the general inmate welfare check.

56. Three overdoses in a five day period was unusual.

57. This was the third suspected overdose in Unit 5.

58. In response, Lt. Walters authorized a search of the entire bottom tier of A-Pod Unit 5.

59. This would have been 501-516, odd numbered cells.

60. Lt. Walters also authorized a visual body cavity search of all inmates housed in the bottom tier of A-Pod Unit 5.

61. The inmates were taken one cell at a time to be stripped searched.

62. A shank, an inmate manufactured weapon, was found on inmate Louie Grijalva during a strip search.

63. After the shank was located, Grijalva was relocated to D-Pod.

64. Lt. Hernandez has been with KCSO since 2005.

65. In 2011 Lt. Hernandez took a one year break and worked for the DEA, but returned to KCSO.

66. KCSO policy C450, "Safety Checks", is basically copied and pasted from Title 15 and explains what the safety checks should be.

67. The deputies are required to physically walk into the units and see the inmates, whether they are out in the dayroom or in their cells.

68. Lt. Hernandez reviewed all of the security videos from June 26 and the security checks were all within the BSCC standards.

69. Lt. Hernandez did not review the June 27 videos because those had already been reviewed by another detective for the death review.

70. The death review contained a review of approximately 4 hours prior to Grijalva's death, so Lt. Hernandez did not feel it was necessary to repeat that work.

71. There are multiple ways drugs come into the facility.

72. Sometimes family members on the outside are involved; sometimes they get them from medical appointments, sometimes in the mail.

73. KCSO has hired a new mail processing system to prevent the drugs from coming in through the mail.

74. Lt. Hernandez is familiar with, and re-reviewed documents regarding the three incidents in A-Pod during June of 2022.

75. Fentanyl is a relatively new drug being smuggled into the jails.

76. Fentanyl is easier to hide because it's extremely powerful.

77. KCSO is not aware of how Grijalva was able to obtain fentanyl.

78. The investigation was focused on how drugs were coming in, not necessarily specifically on Grijalva.

79. Inmates do not talk to the deputies about the drugs.

80. Inmate Laborers are more trusted inmates, and at least one has opened up to Hernandez on how drugs are passed.

81. Drugs are also received during the court process, when inmates go to court they obtain the drugs and bring them back to the facility.

82. The parties reviewed the video on the record.

83. Deputy Navarro is seen on camera conducting a security check at 14:33.

84. At 15:17 Deputy Navarro appears to be making his way to Mr. Grijalva.

(Doc. 57-1 at 1-11 [hereafter UDF].)

**VI.    SUMMARY OF DEFENDANT COUNTY'S UNOPPOSED MOTION**

Defendant County contends Plaintiff's allegations do not establish *Monell* liability because (1) Plaintiff cannot establish any unconstitutional official policy, (2) Plaintiff cannot establish an unofficial custom or practice relating to the drug infiltration or inadequate training of the County's deputies, and (3) Plaintiff cannot establish a *Monell* claim based upon ratification.

11

More specifically, Defendant County maintains it has adopted written policies, including policies pertaining to minimum performance standards for personnel assigned to detention facilities, general and body cavity searches, housing searches and welfare checks, inmate mail/ package receipt and searches, and fraternization. Defendant contends its policies are "reasonable measures for detecting and confiscating illegal drugs within the jails" and that there is no evidence to suggest jail personnel "engaged in any customs or practices involving alleged narcotics smuggling or allowed inmates with ties to gangs to engage in drug sales or drug trafficking." Rather, Defendant contends, "there is abundant evidence" indicating staff relied on strip and cell searches, body scanners, intelligence gathering, and the use of confidential informants, to "to intercept drugs coming inside of the jail." Defendant argues it is "undisputed these policies are constitutional on their face" and that Plaintiff has failed to proffer evidence otherwise.

Next, Defendant County argues Plaintiff cannot establish an unofficial custom or practice relating to drug infiltration or inadequate training of jail personnel. Defendant asserts jail personnel employed multiple measures "to clear the jail of any illegal drugs or other contraband." County contends that in the days preceding this incident, and in response to three overdoses within five days, a search of the "entire bottom tier of A-Pod, Unit 5" was conducted, visual body cavity searches of all inmates housed there were authorized, the inmates assigned to the unit "were taken on[e] cell at a time to be strip-searched," and a canine was brought in during "this unusually high overdose period" despite not having "a canine unit assigned to the jail at that time." Defendant County further argues that other routine measures can detect contraband: hourly safety checks requiring jail personnel to "put eyes on each inmate in the dayroom or cells," random cell and pat down searches, and the use of body scanners and metal detectors. County asserts that Grijalva was moved from A-Pod, Unit 5 to D-Pod based on the searches conducted in the days preceding his death and in response to the three overdoses. Once Grijalva was housed in D-Pod, Defendant Navarro conducted a security check "at or around 14:33, immediately before the incident," and responded to a medical priority concerning Grijalva "at around 5:17." About two minutes later, Navarro called medical and medical staff responded "[a]t or around 15:21."

12

County maintains it responded appropriately immediately prior to, during, and after Grijalva's death. County contends there is no evidence of wrongdoing by Navarro or any other deputy and concludes "there is no unofficial custom or lack of training apparent from this incident."

Finally, Defendant County contends Plaintiff cannot establish a *Monell* claim based on ratification. County asserts that because the only evidence available demonstrates that final policymakers acted appropriately by conducting "sweeping searches of the bottom tier of A-Pod," strip, cavity, and body searches of the inmates housed there, and bringing in a canine to address fentanyl infiltration in the jail, Plaintiff cannot show a policymaker approved of a subordinate's constitutional violation.

## VII.   EVIDENTIARY MATTERS

Because Plaintiff did not file an opposition to Defendant County's motion, her verified complaint will be considered in opposition to the motion to the extent its factual statements are based upon Plaintiff's own personal knowledge. Fed. R. Civ. P. 56(e); *see Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (the court considers as evidence those parts of the verified complaint based on plaintiff's personal knowledge); *Schroder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) ("Schroeder filed a verified complaint. A verified complaint may be used as an opposing affidavit under Rule 56. To function as an opposing affidavit, however, the verified complaint must be based on personal knowledge and set forth specific facts admissible in evidence" [citations & footnotes omitted]).

## VIII.   DISCUSSION

### A.   Plaintiff's *Monell* Claim

Plaintiff's fifth cause of action in the second amended complaint asserts a *Monell* claim against the County of Kern. (Doc. 43 at 44-56.)

More specifically, Plaintiff alleges all Defendants "were and are aware that the KCJ [Kern County Jail] system is fraught/rife with dangerous narcotic substances, such as fentanyl, heroin, and methamphetamine," and "are especially prevalent in LPTF [Lerdo Pre-Trial Facility], which is the largest correctional institution controlled" by the Kern County Sheriff's Department and the County of Kern. (Doc. 43 at 44, ¶¶ 174-175.) Plaintiff further alleges Defendants "are aware that

13

the 'drug trade' throughout the KCJ system is assisted, in part," by deputy sheriffs, custody officers, and other jail staff "who either participate(d) directly in smuggling drugs" into or were deliberately indifferent to the presence of drug smuggling in KCJ facilities" and "that a high percentage" it those inmates "have drug problems or are otherwise suffering from drug addictions." (*Id*., at 45, ¶¶ 176-177; *see id*. at 45-46, ¶ 180 [duplicative of ¶ 176].) She further asserts Defendants were aware "that substances, such as fentanyl, are especially dangerous, because only a small amount is sufficient to induce death via 'overdose.'" (*Id*., ¶ 178.) Next, Plaintiff alleges that "because prisoners in the KCJ system are 'captives' of" the Kern County Sheriff's Department and the County, "they are unable to avoid dangerous narcotics as they would be able to outside of KCJ facilities." (*Id*., ¶ 179.)

Plaintiff alleges the County is aware that "numerous" deputy sheriffs, custody officers, and other jail staff or agents "have been involved in smuggling and/or selling illegal drugs, including smuggling/selling of drugs within the KCJ system" and that "in many cases" those individuals "do so at the behest of, or in conspiracy with organized crime enterprises, such as gangs." (Doc. 43 at 46, ¶¶ 181-182.) Plaintiff avers that the County is aware that: (a) in 2020, an aide employed by the Kern County Sheriff's Department was arrested for smuggling drugs and cellphones into the Lerdo facility, intending to sell the contraband, and that the aide "did so in participation with a criminal street gang, in conspiracy with at least 13 other inmates," and that the Kern County District Attorney's Office "decided not to charge" the aide and instead "sent the case back … for more investigation;" (b) in 2013, a deputy sheriff was arrested for smuggling drugs into the Lerdo facility while working, "in conspiracy with local gang members" housed there; the deputy "was regarded as a 'gangster with a badge' by the inmates; although charged with five felonies, the deputy pled no contest "to one conspiracy charge and was sentenced to a single day in jail with credit for time served" and the remaining charges were dismissed; (c) in 2022, a deputy sheriff was "caught smuggling drugs into" the Lerdo facility while working and was "using those same drugs while on duty;" charged with misdemeanor intoxication and possession charges, those charges were dismissed after the deputy attended drug classes; she was never charged with violating California Penal Code sections 4573 and 4573.5, both felonies; (d)

14

in 2014, two sheriff's deputies "stole large amounts of drugs from an evidence locker and conspired with" Bakersfield police officers to "sell the drugs on the street;" all four pled guilty to state and federal charges; (e) in 2006, a detentions sergeant and deputy were arrested on suspicion of conspiracy to sell illegal narcotics, and a third deputy sheriff was arrested for possession of cocaine; at the time, the sergeant worked at the Lerdo facility and the others worked at the Central Receiving Facility; the charges against the detentions sergeant and deputy sheriff were dismissed in the furtherance of justice and the detention deputy pled no contest to violating California Health and Safety Code section 11366.5(a) and was sentenced to a single day in jail; (f) in 2015, a sheriff's deputy "was arrested on suspicion of bringing drugs into" the Lerdo facility; and (g) the above instances "represent only a partial list" of Kern County deputies, staff, or agents who have brought drugs into the Lerdo facility "or otherwise because involved in the 'drug trade.'" (*Id*. at 46-48, ¶ 183.)

Further, Plaintiff alleges Defendant County is "aware of the pattern of misconduct" by its deputy sheriffs, custody officers, jail staff, and other agencies, where they "abused their positions of authority to become involved in the drug trade" and that those individuals "often facilitate the flow of drugs" into the jail facility "for the purpose of sales to jail inmates." (Doc. 43 at 48-49, ¶ 184.) Despite that awareness, Plaintiff alleges the County "repeatedly and persistently refused to adopt drug interdiction policies and procedures to minimize instances of" those individuals "becoming involved in the drug trade to jail inmates." (*Id*. at 49, ¶ 185.) Instead, Plaintiff avers the County "has a practice of protecting law enforcement officers" and jail staff who abuse their positions of authority. (*Id*., ¶ 186.) The ways the County protects those individuals who engage in "misconduct include, but are not limited to," the following: (a) failing to "inquire about suspicious behavior … which suggests their potential involvement in the drug trade, and 'looking the other way' when confronted with such activity to avoid departmental embarrassment; (b) failing to adopt policies and procedures to keep staff "from engaging drug-related activities" and otherwise preventing illegal activity; (c) failing to require adherence to "stated policies and procedures" meant to prevent "engaging drug-related activities" and otherwise preventing illegal activity; (d) failing to enforce policies and procedures meant to prevent drug and illegal activity;

15

(e) failing to document and investigate incidents of drug related activity "so that such cases can be properly prosecuted;" (f) conducting investigations "behind closed doors" of those involved in drug-related activity in the absence of transparency and "without announcing findings or facts;" (g) failing to "prosecute clear and widespread involvement" of its staff involved in drug-related activity, "quietly dismissing charges against" those individuals involved and/or allowing them "to escape with de minimis punishment." (*Id.* at 49-51, ¶ 186.) Those practices, Plaintiff alleges, fail to deter others from becoming involved in the drug trade. (*Id.* at 51, ¶ 187.)

Moreover, Plaintiff alleges Defendant County is aware that "numerous inmates" have suffered from drug overdoses and died while in its custody in the previous 20 years. (Doc. 43 at 51, ¶ 188.) Plaintiff alleges that in 2015 and 2021, respectively, two inmates were found unresponsive in the jail facility and "died from an overdose" while in County's custody; in 2022, another inmate died of an overdose at the Lerdo facility; and in 2023, one inmate "was found dead in his cell" at the Lerdo facility, four others overdosed and died while in custody at the Lerdo facility, another died of an overdose at the Mojave facility, and two others "died from an overdose at a hospital while" in the County's custody. (*Id.* at 51-53, ¶ 188.) Plaintiff avers that County "has a practice of covering up in-custody overdose deaths" and that in "2023, thus far, 8 people have died" while in the County's custody and although "many of these deaths are suspected of being overdose deaths," County "delays publicly publishing information about the causes of death in order to minimize civil liability, and otherwise refuses to release information to the public." (*Id.* at ¶¶ 189-190.)

Next, Plaintiff alleges that Defendant County "officials including DOES 7 through 10 … know with certainty that unless the flow of dangerous drugs into KCJ facilities is curtailed, and steps are taken to discipline and terminate" involved County employees "who facilitate such activity, more inmates *will* die in COUNTY custody due to overdose." (Doc. 43 at 53-54, ¶ 191, italics in original.) Those same individuals are aware the policies and procedures for preventing illegal drug trade "are inadequate and/or poorly enforced" and "knew/know or had/have reason to know" that Defendant Navarro "and/or DOES 1 through 6, are involved in trafficking/smuggling/selling of dangerous drugs in KCJ facilities." (*Id.* at 54, ¶¶ 192-193.)

16

Plaintiff alleges that despite the County's knowledge of those facts, County "officials, including DOES 7 through 10, have a policy of inaction with regard to drug interdiction techniques in KCJ facilities, specifically with regard to the drug fentanyl" and that those individuals "failed to properly supervise, train, and instruct" subordinate staff drug interdiction techniques and "proper medical response to drug overdoses in the KCJ system, specifically with regard to the drug fentanyl." (*Id*. 54-55, ¶¶ 194-196.)

Plaintiff alleges that as a direct and proximate result of the deficient policies, customs and practices of Defendant County, including Does 7 through 10, Grijalva suffered a fentanyl overdose and died of acute fentanyl toxicity while in County's custody. (Doc. 43 at 55, ¶ 197.) Grijalva's death "at the KCJ constituted a violation of" his Eighth and Fourteenth Amendment rights and County is thus liable for the constitutional harms alleged. (*Id*., ¶¶ 198-199.) Further, Plaintiff avers that as a direct and proximate result of County's constitutionally deficient policies, customs, and practices, Grijalva "suffered physical, mental and emotional pre-death pain and suffering, and the loss of life and the enjoyment of the rest of his life (his hedonistic damages) all in an amount to be determined at trial in excess of $20,000,000.00." (*Id*. at 55-56, ¶ 200.) Finally, Plaintiff alleges that as a direct and proximate result of County's constitutionally deficient policies, customs, and practices, Plaintiff suffered the loss of her parent-child relationship with Grijalva, including the loss of his love, society and comfort, and has suffered severe mental and emotional pain, suffering, and distress, all in an amount to be determined at trial in excess of $20,000,000.00." (*Id*. at 56, ¶ 201.)

## B.  Defendant County's Evidence

The Court has reviewed Defendants' evidence offered in support of the motion, including its official policies concerning minimum performance standards (Doc. 57-4), general searches (Doc. 57-5), strip and body cavity searches (Doc. 57-6), housing searches and welfare checks (Doc. 57-7), inmate mail and packages (Doc. 57-8), and fraternization (Doc. 57-90), as well as the depositions given by Lieutenants Harris and Hernandez (Docs. 62-1 & 62-2).

//

//

17

**1. Defendant County's Official Policies**

Defendant County maintains official policies concerning minimum performance standards, general, strip, body and housing searches, welfare checks, searches involving inmate mail, and fraternization; those policies seek to prohibit and deter, and identify and confiscate, contraband, including narcotics, from its Lerdo facility. UDF 26, 53-55, 66-67; Docs. 57-4 through 57-9. The undersigned concludes Defendant County has met its initial burden of demonstrating the absence of a genuine issue of material fact that County's official policies are inadequate to defeat the drug trade in the Lerdo facility or inadequate regarding training and supervision. *Celotex*, 477 U.S. at 323. The burden thus shifts to Plaintiff.

Plaintiff has failed to provide evidence that Defendant County's official policies violated Plaintiff or Decedent's constitutional rights. Plaintiff proffers neither affidavits or other sources of evidence that "set forth specific facts showing that there is a genuine issue for trial." Fed. Civ. P. 56(e); *Celotex*, 477 U.S. at 323-24; *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1107 (9th Cir. 2000) (holding that once the moving party carries its initial burden of production, "the nonmoving parties were obligated to produce evidence in response"); *Henry*, 983 F.2d at 950.[3]

Further, Plaintiff's verified complaint does not overcome County's evidence in this regard because its allegations are not based on Plaintiff's personal knowledge. Fed. R. Civ. P. 56(e); *Jones*, 393 F.3d at 923. For example, Plaintiff has no personal knowledge that the County failed to adhere to its own policies preventing narcotic activity at its facilities. Nor does Plaintiff have personal knowledge that the County had a practice of protecting its law enforcement officers and covering up those officers' actions. Further, Plaintiff has no personal knowledge that County

---

[3] *See also, e.g.*, *Carroll v. City of Stockton*, No. 2:23-cv-00194-DAD-SCR, 2026 WL 861675, at *12 (E.D. Cal. Mar. 30, 2026) (granting summary judgment and holding "plaintiff Carroll neither addresses defendants' argument in this regard, mentions her *Monell* claim at all, or points to any evidence before the court of an official policy, longstanding practice, or custom on the part of the defendant City of Stockton. … Therefore, the court concludes that plaintiff Carroll has failed to come forward with evidence establishing a triable issue of fact as to her *Monell* claim against the City of Stockton or from which a reasonable jury could return a verdict in her favor as to that claim"); *Youngblood v. City of Bakersfield*, No. 1:12-cv-1150 AWI JLT, 2014 WL 1386392, at *11 (E.D. Cal. Apr. 9, 2014) (granting summary judgment and holding "Plaintiff has failed to allege the existence of any policies or customs (beyond those alleged in conclusory language in the complaint) that could fairly be said to cause the constitutional harm Plaintiff suffered. … Plaintiff appears to have abandoned the claim against City of Bakersfield by not alleging any facts at all concerning the existence of policies or customs in her opposition to Defendants' motion").

18

failed to supervise or train its staff regarding drug interdiction techniques. Fed. R. Civ. P. 56(e); *Jones*, 393 F.3d at 923; *Schroder*, 55 F.3d at 460; *Moran v. Selig*, 447 F.3d 748, 759 n. 16 (9th Cir. 2006) ("[A] verified complaint may serve as an affidavit if it is based on personal knowledge and if it sets forth the requisite facts with specificity"); *see Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980) (verified pleading which did not affirmatively show that affiant was competent to testify to matters stated therein or that facts were based on his personal knowledge could not serve as a basis for granting motion for summary judgment); *Les Fields/C.C.H.I. Insurance Services v. Hines*, No. 15-cv-03728-MEJ, 2016 WL 6873459, at *4 (N.D. Cal. Nov. 22, 2016) (granting summary judgment in part and noting "the paragraph of the Complaint that contains the core factual allegations against Defendants is pleaded on information and belief—it is specifically not based on personal knowledge, and it does not set forth specific facts admissible in evidence," and thus could not be treated as evidence).

### 2. Plaintiff Fails to Establish an Unofficial Custom or Practice or Inadequate Training

Defendant County proffers evidence to demonstrate that it took reasonable measures to address three fentanyl overdoses that occurred in the five days preceding Grijalva's death, including authorizing cell and strip and body cavity searches of A-Pod, Unit 5's bottom tier. UDF 36-37, 56-61. And deputies continued to conduct routine safety and welfare checks during the relevant period. UDF 66-68. County's undisputed evidence also demonstrates that fentanyl is difficult to detect because it is easier to keep secret. UDF 39. The evidence also demonstrates that narcotic contraband can enter the County's facility in various ways, including through inmate mail, clothing provided prior to court appearances, by inmates returning from outside medical treatment, and via an inmate's family. UDF 71-72, 81. County's undisputed evidence also reveals that Detention Lieutenant Harris recalled only one instance of a deputy bringing narcotics into the Lerdo facility. UDF 18, 23, 44.  As concerns Grijalva's death, County proffers undisputed evidence to demonstrate that, after Grijalva's move from A-Pod, Unit 5 to D-Pod after he was found in possession of a shank, Defendant Navarro conducted regular safety checks in D-Pod and properly responded to the medical priority call involving Grijalva. UDF 46-50.

The undersigned concludes Defendant County has met its initial burden of demonstrating the absence of a genuine issue of material fact that "there is no unofficial custom or lack of training apparent from" Grijalva's death. *Celotex*, 477 U.S. at 323. The burden thus shifts to Plaintiff.

Here, Plaintiff has failed to present any evidence establishing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). She has tendered no evidence in the form of affidavits or admissible discovery material, nor has she shown the materials cited by Defendant County do not establish the absence of a material fact. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11; *Nissan Fire & Marine Ins. Co.*, 210 F.3d 1099 at 1107; *Henry*, 983 F.2d at 950.[4]

As concerns a failure to train, Plaintiff's contentions alone do not demonstrate a specific training deficiency or a deliberate or conscious choice by Defendant County to fail to train its detention staff. *City of Canton*, 489 U.S. at 390. Moreover, Plaintiff's verified complaint does not overcome County's evidence in this regard because its allegations are not based on Plaintiff's personal knowledge. Fed. R. Civ. P. 56(e); *Jones*, 393 F.3d at 923. For example, Plaintiff has no personal knowledge that Defendant County failed to investigate "suspicious behavior" or "look[ed] the other way" concerning its detention staff employees' alleged narcotics smuggling. And Plaintiff's list of the ways in which the County protects employees who purportedly engage in illegal drug activity, even construed as an argument in opposition to County's summary judgment motion, fails to establish evidence of an unofficial custom or practice. *See, e.g.*, *Turner v. City of Sacramento*, No. 2:20-cv-01079-TLN-JDP, 2022 WL 1608031, at *5, n. 13 ("even if the Court were to construe this statistical information as an argument opposing summary judgment as to *Monell* liability premised on a policy or custom …, Plaintiff provides no evidence showing that the officers in the instant case were motivated by any racially discriminatory motive. Therefore, Plaintiff cannot show City of Sacramento had a custom or policy 'that was the

---

[4] *See also Williams v. County of Sacramento*, No. 2:20-cv-00598-TLN-CSK, 2024 WL 5007385, at *3 (E.D. Cal. Dec. 5, 2024) (granting summary judgment, holding that "with respect to Plaintiff's *Monell* claim based on a customs, policies, or practices theory, he acknowledges that this is the theory of liability pleaded in his Complaint [], but he does not address the merits of this theory in his opposition," and concluding the claim had been abandoned (citing *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)).

"moving force" behind the constitutional violation suffered'"); *Pina v. County of Los Angeles*, No. CV 18-8149 DMG (PLAx), 2020 WL 13588159, *6-7 (C.D. Jan. 2, 2020) (granting unopposed summary judgment motion and holding plaintiffs' *Monell* claims "based on an unconstitutional custom, practice, or policy that allegedly foster rampant sexual misconduct" and inadequate training failed because plaintiffs presented no evidence).

### 3. Plaintiff Failed to Establish Ratification

Defendant County contends "the only evidence available confirms that all the final policymakers who knew of the fentanyl infiltration acted appropriately by ensuring searches were conducted, bringing in a drug canine, ordering sweeping searches of the bottom tier of A-Pod and ordering sweeping searches of inmate's bodies, including strip, cavity and body scan searches," and, therefore Plaintiff has failed to establish a *Monell* claim based on ratification.

To show ratification, a plaintiff must demonstrate "that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002). Although section 1983 liability may attach where an authorized policymaker approved a subordinate's unconstitutional conduct, alleging "a mere failure to overrule a subordinate's actions, without more, is insufficient" to state a claim under this theory. *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). Similarly, alleging a "mere failure to discipline does not amount to ratification." *Adomako v. City of Fremont*, No. 17-cv-06386, 2018 WL 2234179, at *3 (N.D. Cal. May 16, 2018). And a policymaker's "knowledge of an unconstitutional act does not, by itself, constitute ratification." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).

Here, Plaintiff has tendered no evidence in the form of affidavits or admissible discovery material, nor has she shown that the materials cited by Defendant County do not establish the absence of a material fact as concerns any ratification. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11; *see Henry*, 983 F.2d at 950. There is simply no evidence to indicate that any County policymaker delegated authority to a subordinate or approved of a subordinate's unconstitutional conduct. *Ulrich*, 308 F.3d at 985.

And, again, Plaintiff's verified complaint does not overcome County's evidence in this

21

regard because its allegations are not based on Plaintiff's personal knowledge. Fed. R. Civ. P. 56(e); *Jones*, 393 F.3d at 923.

### 4.    The State Law Claims Against Defendant County

The undersigned notes that Defendant County states in its motion for summary judgment that "Defendants request the Court dismiss all claims for relief against Kern County." (*See* Doc. 57 at 12.) The Court presumes Defendants intended to request that summary judgment be entered in favor of Defendant County. (*See id*. at 1, 3.) As noted above, Defendant County is named in Plaintiff's state law failure to summon medical care for prisoner in immediate need, negligence, and wrongful death claims. (*See* Doc. 43 at 56-82). Despite the Court's presumption, and to the extent Defendants seek summary judgment concerning Plaintiff's state law claims, summary judgment should be denied. Defendants have not presented any argument concerning Plaintiff's state law claims and, therefore, have failed to meet their initial burden of production. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322; *see also, e.g.*, *Selto v. Clark County*, No. 22-cv-5384, 2023 WL 6311284, at *9 (W.D. Wash. Sept. 28, 2023) (denying summary judgment, stating "The Court has addressed the arguments made in Defendants' motion but denies without discussion summary judgment on claims not [addressed]"); *Holmes v. Merck & Company*, No. 2:04-cv-00608-BES-GWF, 2007 WL 9728627, at *4-5 (D. Nev. Nov. 1, 2007) (noting "Defendant did not address the substantive merits of Plaintiff's other [state law] claims" in its summary judgment motion, holding Plaintiffs were not required to "expressly oppose" Defendant's motion because it "failed to discharge its initial burden of production," and denying summary judgment as to those claims).

Nevertheless, a "district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Supreme Court has cautioned that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." *United Mine Workers of Amer. v. Gibbs*, 383 U.S. 715, 726 (1966). Therefore, to the extent this Court will recommend Defendant County's summary judgment motion be granted on Plaintiff's *Monell* claim, it will further recommend the Court decline to exercise supplemental jurisdiction over

22

Plaintiff's state law claims against Defendant County.

## IX.     SUMMARY OF FINDINGS

As concerns the *Monell* claim, Plaintiff has tendered no evidence to support her allegations. Rather, she relies solely on the allegations in the operative complaint. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322;  *Matsushita*, 475 U.S. at 586, n. 11. And the core allegations made therein are not based on Plaintiff's personal knowledge. Fed. R. Civ. P. 56(e); *Jones*, 393 F.3d at 923; *Schroder*, 55 F.3d at 460; *Moran*, 447 F.3d at 759 n. 16; *Les Fields/C.C.H.I. Insurance Services*, 2016 WL 6873459, at *4. In sum, Plaintiff has not demonstrated that a reasonable jury could return a verdict in her favor. *Matsushita*, at 587; *Wool*, 818 F.2d at 1436. Therefore, this Court will recommend Defendant County's summary judgment motion be granted concerning Plaintiff's *Monell* claim.

Next, to the extent Defendant County, or Defendants collectively, sought summary judgment on Plaintiff's state law claims against Defendant County, the summary judgment motion should be denied as Defendant County failed to meet its initial burden. Fed. R. Civ. P. 56(c). Nevertheless, because the undersigned recommends summary judgment be granted in favor of Defendant County on Plaintiff's *Monell* claim, it will recommend the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims against Defendant County.

## X.     CONCLUSION AND RECOMMENDATION

Accordingly, for the reasons discussed above, the Court **HEREBY RECOMMENDS** that:

1. Defendant County's motion for summary judgment (Doc. 57) be **GRANTED in part and DENIED in part** as follows:

    a. Defendant County's summary judgment motion be **GRANTED** as concerns Plaintiff's *Monell* claim;

    b. Defendant County's summary judgment motion be **DENIED** as concerns Plaintiff's state law claims against Defendant County; and

2. The Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims against Defendant County.

23

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). **Within 14 days** after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without leave of Court and good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the 15-page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C).

A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:    **June 3, 2026**

UNITED STATES MAGISTRATE JUDGE